**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No._____23-8140-BER_____

**UNITED STATES OF AMERICA**

**vs.**

**VICTOR VAN VICKERY,**

      **Defendant.**
_____/

## CRIMINAL COVER SHEET

1.    Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)? __ Yes  X  No

2.    Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? __ Yes  X  No

3.    Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? __ Yes  X  No

Dated: March 11, 2023

                Respectfully submitted,

                MARKENZY LAPOINTE
                UNITED STATES ATTORNEY

                GLENN S. LEON, CHIEF
                U.S. DEPARTMENT OF JUSTICE
                CRIMINAL DIVISION, FRAUD SECTION

By:    */s/ Andrea Savdie*
                ANDREA SAVDIE
                Trial Attorney
                FL Special Bar No. A5502799
                U.S. Department of Justice
                Criminal Division, Fraud Section
                12020 Miramar Parkway
                Miramar, Florida 33025
                Phone: (202) 262-6453
                Andrea.Savdie@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Victor Van Vickery | ) | Case No. 23-8140-BER |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 2018 to June 2021 _____ in the county of _____ Palm Beach _____ in the _____ Southern _____ District of _____ Florida _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit health care fraud |

FILED BY _____ *TM* _____ D.C.

*Mar 11, 2023*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

_____ Orlando Buissereth, Special Agent, HHS-OIG _____
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by FaceTime

Date: 3/11/23

_____
*Judge's signature*

City and state: _____ West Palm Beach, Florida _____

_____ Honorable Bruce E. Reinhart U.S. Magistrate Judge _____
*Printed name and title*

## **AFFIDAVIT**

I, Special Agent Orlando Buissereth, being duly sworn, do hereby depose and state:

### **Introduction**

1.      I make this affidavit in support of a criminal complaint charging Victor Van Vickery ("**VICKERY**") with Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1349.

2.      I am a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG").  I have been employed in this capacity for approximately three years.  I am currently assigned to the Miami Regional Office, where I investigate a wide variety of health care fraud matters, including schemes to defraud Medicare and Medicaid.  In this capacity, I am authorized to conduct investigations into criminal violations committed against the United States, including but not limited to health care fraud, payment and receipt of illegal health care kickbacks, making false statements in connection with a health care benefit program, and related conspiracies.  I am authorized to apply for and execute arrest warrants for offenses enumerated in Titles 18 and 42 of the United States Code, and to execute search warrants.  Prior to becoming a Special Agent, I served as an investigative analyst for HHS-OIG for approximately two years.  I have received training in investigating various types of criminal activity, including fraud, at the Federal Law Enforcement Training Center in Brunswick, Georgia and the HHS-OIG training center in Largo, Maryland.

3.      I am personally involved in conducting a joint investigation with other federal agencies into alleged criminal activities perpetrated by **VICKERY** as well as several of his associates.   The information contained in this Affidavit is based upon a review of public and

private records, interviews, and other investigative activities conducted by law enforcement personnel assigned to this case.

4.     This Affidavit is submitted for the limited purpose of establishing probable cause that **VICKERY** did knowingly and willfully combine, conspire, confederate, and agree with Conspirator 1, Conspirator 2, and others, in violation of Title 18, United States Code, Section 1349, to commit health care fraud, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

5.     Because this Affidavit is provided for the limited purpose of establishing probable cause for an arrest, I have not included all information known to me regarding this investigation, but, rather, I have set forth only those facts necessary to establish probable cause to believe that the defendant has committed the charged offense.

## The Defendant and Related Entities and Individuals

6.     **VICKERY** was a resident of Palm Beach County, Florida, in the Southern District of Florida.

7.     Conspirator 1 was a resident of Archer County, Texas, in the Northern District of Texas.

8.     Conspirator 2 was a resident of the Philippines.

9.      TB Interests LLC ("TB Interests") was a company formed under the laws of Texas with its principal place of business in Archer City, Texas.  TB Interests was owned by **VICKERY** and Conspirator 1, and purportedly provided marketing services.

10.     Marketing Company 1 was a company located in the Philippines, which operated a call center.  Conspirator 2 managed and controlled Company 1.

11.      DME Company 1 was a company incorporated under the laws of Florida with its principal place of business in Stuart, Florida.  Conspirator 1 was the listed owner of DME Company 1. **VICKERY** was a beneficial owner, operator, or manager of DME Company 1.  DME Company 1 was a DME supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage beneficiaries.

12.     DME Company 2 was a company formed under the laws of Florida with its principal place of business in Stuart, Florida.  Conspirator 1 was the listed owner of DME Company 2. **VICKERY** was a beneficial owner, operator, or manager of DME Company 2.  DME Company 2 was a DME supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage beneficiaries.

13.     DME Company 3 was a company formed under the laws of Florida with its principal place of business in Stuart, Florida.  Conspirator 1 was the listed owner of DME Company 3. **VICKERY** was a beneficial owner, operator, or manager of DME Company 3.  DME Company 3 was a DME supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage beneficiaries.

14.     DME Company 4 was a company formed under the laws of Texas with its principal place of business in Graham, Texas.  Individual 1 was the listed owner of DME Company 4. Conspirator 1 was a beneficial owner, operator, or manager of DME Company 4.  DME Company

4 was a DME supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage beneficiaries.

15.     DME Company 5 was a company formed under the laws of Florida with its principal place of business in Delray Beach, Florida.  Individual 2 was the listed owner of DME Company 5.  **VICKERY** was a beneficial owner, operator, or manager of DME Company 5.  DME Company 5 was a DME supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage beneficiaries.

16.     DME Company 6 was a company formed under the laws of Maryland with its principal place of business in Glen Burnie, Maryland.  Individual 3 was the listed owner of DME Company 6.  **VICKERY** was a beneficial owner, operator, or manager of DME Company 6.  DME Company 6 was a DME supplier that purportedly provided braces to patients, including Medicare and Medicare Advantage beneficiaries.

## The Medicare Program

17.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

18.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

19.     Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries."  Each Medicare beneficiary was given a unique Medicare identification number.

20.     Medicare covered different types of benefits, which were separated into different program "parts."  Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies.  Medicare Part B covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, durable medical equipment ("DME") and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.  Medicare Part C, also known as the "Medicare Advantage," provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans, including health maintenance organizations and preferred provider organizations.  Medicare Part D covered prescription drugs.

21.     Health care providers, such as DME suppliers, laboratories, and pharmacies, that provided and supplied items and services to Medicare beneficiaries were referred to as "providers." Medicare providers were able to apply for and obtain a "provider number."  Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

22.     When seeking reimbursement from Medicare for provided benefits, items, or services, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual.    Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number or Medicare Beneficiary Identifier; (b) the date on which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or

National Provider Identifier.  Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

### Medicare Part B

23.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

24.     To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement.  The Medicare provider enrollment application, CMS Form 855, was required to be signed by an authorized representative of the provider.  CMS Form 855 contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [the provider].  The Medicare laws, regulations, and program instructions are available through the [MAC].  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute…).

25.     CMS Form 855 contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

26.     Payments under Medicare Part B were often made directly to the provider rather than to the beneficiary.  For this to occur, the beneficiary would assign the right of payment to the provider.  Once such an assignment took place, the provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## Medicare Part C – Medicare Advantage

27.     Medicare Advantage, formerly known as "Part C" or "Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans ("Medicare Advantage Plans"), rather than through Medicare Parts A and B.

28.     Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same services and supplies offered under Medicare Part A and Part B.  To be eligible to enroll in a Medicare Advantage Plan, an individual had to have been entitled to receive benefits under Medicare Part A and Part B.

29.     A number of private health insurance companies, along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to beneficiaries through various Medicare Advantage Plans.  These health insurance companies, through their respective Medicare Advantage Plans, adjudicated claims in locations throughout the United States, and often made payments directly to providers, rather than to the beneficiaries who received the health care benefits, items, and services.  This occurred when the provider accepted assignment of the right to payment from the beneficiary.

30.     To obtain payment for services or treatment provided to beneficiaries enrolled in Medicare Advantage Plans, providers were required to submit itemized claim forms to the beneficiary's Medicare Advantage Plan.  The claim forms were typically submitted electronically via the internet.

31.     When providers submitted claim forms to Medicare Advantage Plans, the providers certified that the contents of the forms were true, correct, complete, and that the forms were prepared in compliance with the laws and regulations governing Medicare.  Providers also certified that the services being billed were medically necessary and were in fact provided as billed.

32.     The private health insurance companies offering Medicare Advantage Plans were paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary received.  These payments by Medicare to the health insurance companies were known as "capitation" payments.  Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage Plan, regardless of whether the beneficiary utilized the plan's services that month.  CMS determined the per-beneficiary capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusted the capitation rates annually, taking into account each beneficiary's previous complaints, diagnoses, and treatments.  Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

## Medicare Part D

33.     In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare Part D drug plans were operated by private health care insurance companies approved by Medicare and referred to as drug plan "sponsors."  A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

34.     CMS compensated the Medicare sponsors for providing prescription drug benefits to beneficiaries.  CMS paid Medicare sponsors a monthly capitation fee for each beneficiary enrolled in the Medicare sponsors' plans.  In addition, in some cases where a Medicare sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare sponsor for a portion of those additional expenses.

35.     Typically, Medicare did not process its insureds' prescription claims directly. Instead, Medicare's drug plans were administered by pharmacy benefit managers ("PBMs"),

whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

36. A pharmacy could participate in Medicare Part D by entering into a provider agreement with a Part D drug plan or with a PBM. Pharmacies entered into contractual agreements with PBMs either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers. By contracting with drug plans or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

37. Upon receiving prescriptions, pharmacies submitted claims to Medicare or to PBMs for dispensing prescription drugs. Medicare and PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

38. Under the Social Security Act, Medicare covered Part D drugs that were dispensed upon a valid prescription and for a "medically accepted indication." 42 U.S.C. § 1395w-102(e). Medicare generally did not cover drugs meant for prevention of disease and only covered drugs meant to treat an existing illness or injury.

39. To prevent fraud, waste, and abuse, Medicare and PBMs required providers, including pharmacies, to collect copayments from beneficiaries prior to or soon after the service or item was provided and specified that copayments could not be systematically waived or reduced. Consistent copayment collection was a fraud prevention measure, as copayments gave beneficiaries financial incentives to reject medications that were not medically necessary or had little or no value to beneficiaries' treatments.

**Durable Medical Equipment**

40.     Medicare Part B covered an individual's access to DME, such as off-the-shelf ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively, "braces").  Off-the-shelf braces require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

41.     A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed physician or other qualified health care provider.

42.     For certain DME products, Medicare promulgated additional requirements that a DME order must meet for an order to be considered "reasonable and necessary."  For example, for off-the-shelf knee braces billed to Medicare under the Healthcare Common Procedures Coding System ("HCPCS") Codes L1833 and L1851, an order is deemed "not reasonable and necessary" and is not eligible for reimbursement unless the ordering physician documents the beneficiary's knee instability using an objective description of joint laxity determined through a physical examination of the beneficiary.

**Genetic Testing**

43.     Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future, including certain types of cancers (known as cancer genetic or "CGx" testing), cardiovascular disease, diabetes, obesity, Parkinson's disease, Alzheimer's disease, and dementia. Pharmacogenetic tests ("PGx" tests) were laboratory tests that used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications.

44.     Except for certain statutory exceptions, Medicare did not cover laboratory testing

that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

45.     If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem" and "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

46.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

### Foot Baths

47.     Providers sometimes prescribed antibiotic and antifungal drugs to be used in foot baths. These foot bath medications were prescribed, purportedly, to treat a variety of fungal, bacterial, or other types of foot infections.

48.     Beneficiaries were prescribed a cocktail of expensive drugs (including capsules, creams, and powders), provided with a plastic foot tub free of charge, and instructed to mix the medications with warm water to soak their feet.

49.     These foot bath cocktails routinely included vancomycin 250 milligram capsules, calcipotriene 0.005% cream, clindamycin phosphate 1% solution, ketoconazole 2% cream, and

other expensive drugs.   Typically, the drugs selected for use in foot baths did not require pre-authorization from Medicare prior to prescribing them to a beneficiary.  Additionally, the majority of these drugs were not subject to utilization management, meaning there was no limit on the quantity of drugs that could be ordered in a single prescription.

## Telemedicine

50.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or a telephone, to interact with a patient. Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers.

51.     Medicare covered expenses for specific telehealth services if certain requirements were met.  These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.  In or around March 2020, in response to the COVID-19 pandemic and in order to enable access to care during the public health emergency, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

## Probable Cause

52.     As outlined in greater detail below, there is probable cause to believe that from in or around August 2018, and continuing through at least in or around June 2021, **VICKERY**, Conspirator 1, Conspirator 2, and others conspired to commit health care fraud, causing over $50

million of false and fraudulent billing to Medicare, of which Medicare paid over $25 million.  The conspiracy operated as follows:

    a.  **VICKERY** and Conspirator 1 agreed to pay kickback and bribes to Conspirator 2, who operated offshore call centers—including Marketing Company 1—that used high-pressure and deceptive tactics to get Medicare beneficiaries to accept DME, foot baths, and genetic testing;

    b.  In exchange for these kickbacks and bribes, Conspirator 2 provided **VICKERY** and Conspirator 1 with patient information (known as "leads") necessary to bill Medicare for the aforementioned medical products, and in some instances, provided signed doctor's orders for those products;

    c.  When **VICKERY** and Conspirator 1 obtained leads from Conspirator 2 without a signed doctor's order, **VICKERY** and Conspirator 1 paid kickbacks and bribes to purported telemedicine companies to have medical practitioners sign off on the orders regardless of medical necessity;

    d.  **VICKERY** and Conspirator 1 would use some of the doctor's orders obtained from Conspirator 2 and the purported telemedicine companies to bill Medicare through DME Company 1, DME Company 2, DME Company 3, DME Company 4, DME Company 5, and DME Company 6 for braces that were medically unnecessary and ineligible for reimbursement;

    e.  **VICKERY** and Conspirator 1 would also sell leads and doctor's orders for medically unnecessary DME, foot baths, and genetic testing to other DME suppliers, pharmacies, laboratories, and marketers in exchange for kickbacks and bribes.

53.     During the course of this investigation, law enforcement has obtained statements from witnesses and cooperators, Medicare data, Medicare enrollment documents, documentary evidence, financial records, and electronic communications that establish probable cause to believe **VICKERY** committed the charged offense.

54.     For example, during interviews on or about October 19, 2021, and on or about May 26, 2022, Cooperating Witness 1 ("CW-1")—who has pleaded guilty to conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349) and conspiracy to possess with intent to distribute a controlled substance (18 U.S.C. § 846) and is cooperating in the hopes of obtaining a lower sentence—told law enforcement agents that, in early 2020, he and his business partner met with **VICKERY** and Conspirator 1 at a restaurant to discuss purchasing doctor's orders for CW-1's DME companies.   CW-1 stated that **VICKERY** and Conspirator 1 supplied him and his partners with hundreds of doctor's orders for braces for CW-1's DMEs, which were used to bill Medicare.   Conspirator 1 told CW-1 that the doctor's orders were obtained through "doctor chasing."[1] CW-1 later realized that this was not true because the beneficiaries were returning the braces and the doctors whose signatures appeared on the doctor's orders said they had not prescribed the braces and that their signatures were forged.

55.     CW-1 further stated that **VICKERY** and Conspirator 1 jointly owned DME companies, but that **VICKERY**'s name was not on the companies because he had a criminal record.  CW-1 told law enforcement that **VICKERY** and Conspirator 1 asked him and his business partners advice on whether **VICKERY** and Conspirator 1 should have their DME companies under different names in case one of the companies was shut down by Medicare.  Conspirator 1

---

[1] From my training and experience, I understand that "doctor chasing" is the process of the marketing companies faxing or providing the beneficiary's primary care physician with a proposed prescription. Marketers repeatedly call the doctor's office in an effort to coax the doctor into signing the prescription.

also told CW-1 that he was told to avoid putting too many doctor's orders through his DMEs at one time because it would raise red flags with Medicare. CW-1 stated that **VICKERY** and Conspirator 1 worked with an overseas call center and that Conspirator 1 tried to get CW-1 to buy into the call center but that it did not sound "kosher."

56.     CW-1's statements are corroborated by bank records, as well as text messages CW-1 provided to law enforcement. For example, bank records obtained through a subpoena show four wire transfers of $120,000 from CW-1's company to TB Interests' bank account. On or about January 22, 2020, Conspirator 1 texted CW-1 a screenshot of one of the wire transfers, and CW-1 responded: "He gave you the drop box info." Conspirator 1 replied: "Yes we are set and stuff will go in tomorrow." CW-1 then wrote "The break up of the 200 is Company A 75 Company B 75 Company C 50." On or about February 5, 2020, CW-1 texted Conspirator 1 a list of beneficiary names and wrote "what came back today." Conspirator 1 replied: "Ok I'll get those replaced."

57.     During an interview on June 14, 2022, Cooperating Witness 2 ("CW-2"), who has pleaded guilty to conspiracy to commit health care fraud (18 U.S.C. § 1349) and is cooperating in the hopes of obtaining a lower sentence, stated that **VICKERY** and Conspirator 1 owned a marketing company that sold doctor's orders for DME, foot baths, and possibly laboratory testing. CW-2 agreed to buy doctor's orders from **VICKERY** and Conspirator 1 because they were purportedly using doctor chasing to generate orders, were selling the orders for cheap, and CW-2 wanted to start reselling such orders, which were in high demand. CW-2 wired money to **VICKERY** and Conspirator 1 in exchange for the doctor's orders. When he received the doctor's orders, he thought they did not look legitimate, so he began calling some of the doctors. According to CW-2, some doctors said they did fax the prescriptions while others said they did not. CW-2 confronted Conspirator 1, who stated he was also using those doctor's orders for his own DME

companies and did not have issues.  CW-2 told law enforcement he could not get a clear answer from Conspirator 1 on whether the doctor's orders were real or fake.  CW-2 also stated that **VICKERY** told him that he and Conspirator 1 sold doctor's orders for foot baths to a pharmacy located in Missouri.

58.     During an interview on February 21, 2023, Cooperating Witness 3 ("CW-3"), who has pleaded guilty to conspiracy to commit health care fraud (18 U.S.C. § 1349) and is cooperating in the hopes of receiving a lower sentence, stated that **VICKERY** offered to sell him doctor's orders for his DME companies.  CW-3 stated that, although he declined, he and **VICKERY** regularly talked about their DME businesses.  **VICKERY** told CW-3 that he was opening several DME companies with Conspirator 1.  However, Conspirator 1 told CW-3 that the DME companies would not be under **VICKERY**'s name because he had a criminal record.  CW-3 identified DME Company 1 and DME Company 2 as two of **VICKERY**'s DME companies.  CW-3 also stated that **VICKERY** sold genetic testing doctor's orders to the owners of laboratories.

59.     During an interview on May 5, 2022, Cooperating Witness 4 ("CW-4"), who has pleaded guilty to conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349) and tax evasion (26 U.S.C. § 7201 and 18 U.S.C. § 2) and is cooperating in the hopes of receiving a lower sentence, stated that TB Interests paid his company, Telemedicine Company 1, to arrange for telemedicine practitioners to sign the doctor's orders that TB Interests generated through its telemarketing operation.  CW-4 told law enforcement that, although CW-4 billed TB Interests for telemedicine "consultations" regardless of whether or not they resulted in an approved prescription, the prescriptions were approved over 90% of the time and the expectation was that Telemedicine Company 1 would script the leads submitted by TB Interests.  CW-4 recalled that, oftentimes, if a telemedicine practitioner refused to sign a prescription, Conspirator 1 would

demand that the prescription be routed to another practitioner who would approve it. Emails that law enforcement obtained through this investigation corroborate this statement. For example, on July 10, 2020, Conspirator 1 sent an email to employees of Telemedicine Company 1, copying **VICKERY**, in response to an invoice from Telemedicine Company 1. Conspirator 1 wrote "This is 2 weeks in a row the denials are high can we please clean this up and send to another dr?"

60.     CW-4 described TB Interests as a problematic account, noting that TB Interests' prescriptions had so many braces on them that it was one of the reasons CW-4 eventually put in a cap on the number of braces per prescription. Email communications obtained through this investigation show employees at Telemedicine Company 1 raising concerns that the number of braces on TB Interests' prescriptions was "excessive" and would raise red flags with Medicare. CW-4 also noted that, when his company contacted beneficiaries to verify information on TB Interests' prescriptions, many claimed they had never requested the prescribed items. CW-4 provided law enforcement with copies of signed doctor's orders that his telemedicine company supplied to TB Interests, which contain "TB Interests" under the "ID #" field at the top. CW-4's main point of contact at TB Interests was Conspirator 1, but CW-4 stated that **VICKERY** worked with Conspirator 1. Additionally, emails obtained through this investigation show that **VICKERY** was sending CW-4's business partner templates for doctor's orders, including a genetic testing requisition form for a laboratory that purchased doctor's orders from **VICKERY**.

61.     During an interview on January 19, 2022, Cooperating Witness 5 ("CW-5"), who has pleaded guilty to conspiracy to commit health care fraud (18 U.S.C. § 1349) and is cooperating in the hopes of receiving a lower sentence, stated that he purchased genetic testing leads from **VICKERY** and Conspirator 1 in 2018. CW-5 would get the leads scripted through his telemedicine operation and then sell the completed doctor's orders to laboratories that would bill

Medicare for the genetic test.  CW-5 told agents that he agreed to pay **VICKERY** and Conspirator 1 a percentage of the amount Medicare reimbursed the lab for each beneficiary, subtracting a "telemedicine fee" that CW-4 would keep.

62.     CW-5 provided emails to law enforcement that corroborate these statements.  For example, on October 11, 2018, Conspirator 1 emailed CW-5, copying **VICKERY**, stating "we did business with you guys because you claim to be stand up guys and pay people.  We have done our part with supplying you with patients and you are NOT doing your part."  CW-5 responded that he was waiting on payment from the lab before paying Conspirator 1 and **VICKERY**, to which **VICKERY** then replied "what do you mean waiting for the lab to pay you? I thought you were the lab? So Was this lab in the Palmetto mac , is this why there has been such a delay on payment?" On or about October 12, 2018, Conspirator 1 sent an email to CW-5, copying **VICKERY**, stating "I sent you the info yesterday we are waiting on. you told tory that you would send reports and payment today. now you will not respond to his text…"  CW-5 replied "Focused on getting reporting done for both CgX and DME Like i told Vic…"

63.     Law enforcement also interviewed beneficiaries who received braces that DME Company 1, DME Company 2, DME Company 3, DME Company 4, and DME Company 5 billed to Medicare.  The beneficiaries stated that they did not want or need the braces, that they never consulted with a doctor (through telemedicine or otherwise) about the braces, and that they were pressured by telemarketers to accept the braces.  Some of those beneficiaries also submitted complaints to Medicare or HHS-OIG when they realized Medicare had been billed for the braces. The following is an example of a complaint submitted by a beneficiary to HHS-OIG's hotline after receiving a brace from DME Company 1:

> THE COMPANY CALLED ME, SAID THEY REPRESENTED MEDICARE. THEY HAD MY MEDICARE # AND ADDRESS. I SAID I DIDN'T NEED

ANYTHING. BUT THEY SAID I DID AND SENT ME A SHOULDER DEVICE THAT I IMMEDIATELY REFUSED & RETURNED. CALLED MY MD TOLD HIM NOT TO AUTHORIZE – HE DIDN'T AUTHORIZE. THE COMPANY BILLED MEDICARE $900 AND BILLED ME FOR $179.65. I REFUSED TO PAY. THEY KEPT CALLING AND I REPORTED THE MATTER 4 TIMES TO OIG.SSA.GOV/. WHAT DO I DO ABOUT THEIR BILL FOR SERVICES I DID NOT AUTHORIZE? WHAT CAN YOU DO ABOUT THEIR ROBBING MEDIARE OF $892.38? WHAT DO I DO ABOUT THIS COMPANY HAVING MY MEDICARE #? NOW THEY ARE STARTING TO CALL ME AGAIN FOR OTHER PRODUCTS BUT THIS TIME I TOLD THEM THAT THEY WERE A SCAM AND TO LEAVE ME ALONE. HELP!

64.    Email communications obtained through this investigation show that **VICKERY** knew that, as a result of his telemarketing and DME scheme, Medicare beneficiaries were receiving, and Medicare was being billed for DME that was medically unnecessary and that beneficiaries did not request.  For example, on or about September 9, 2020, Conspirator 1 forwarded an email to **VICKERY** regarding a beneficiary who had received braces from DME Company 4 and had called the brace manufacturer to complain.  The email attached a recording of the brace manufacturer's conversation with the beneficiary, who stated that the telemarketer who called him to get him to accept the braces "badger[ed]" him, kept calling him back after the beneficiary hung up on him four times, and kept him on the phone for two hours.  The beneficiary said that he "felt threatened" and agreed to a back brace after he was "pushed" to do so.  The beneficiary then stated in the recording that he received knee braces in the mail instead of the back brace, and that he had no need for knee braces and had never had them prescribed by a doctor.

65.    Based on the foregoing, I respectfully submit that there is probable cause to believe that **VICKERY** conspired with others to commit health care fraud, in violation of Title 18, United States Code, Section 1349.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Orlando Buissereth
Special Agent
Department of Health and Human Services
Office of Inspector General

Attested to in accordance with the requirements
of Fed. R. Crim. P. 4.1 by FaceTime on
March 11, 2023.

THE HONORABLE BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE